UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,

              Plaintiff,          00 Cr. 1251

     -against-

                            MEMORANDUM OPINION

RAMIRO RODRIGUEZ,

              Defendant.

------------------------------------X

A P P E A R A N C E S:

Attorney for Plaintiff

U.S. DEPARTMENT OF JUSTICE
United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, NY 10007
By: Helen Cantwell, Esq.


Attorney for Defendant

ELIZABETH MACEDONIO, ESQ.
42-40 Bell Blvd.
Suite 302
Bayside, NY 11361

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/12/08

**Sweet, D.J.**

The Court of Appeals has remanded this action for a determination as to whether the substance of the lies of Patricia Lopez ("Lopez") in her initial proffer session was material to the defense of defendant Ramiro Rodriguez ("Rodriguez" or the "Defendant") and, if so, whether the Government's failure to disclose that substance prejudiced Rodriguez and thereby constituted a violation of the Government's obligations under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Giglio, 405 U.S. 150 (1972). United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007).

The Government submitted a letter memorandum, as did Rodriguez, and a hearing was held on January 17, 2008, at which argument was heard upon the facts as set forth in the parties' submissions. No additional evidence was adduced.

### The Charges

The Defendant and co-defendants Patricia Lopez ("Lopez"), Hector Penaranda ("Penaranda"), Ramon Echivaria

1

("Echivaria") and Jose Parrado ("Parrado" or collectively, the "Defendants") were charged with conspiracy to distribute and possessing with intent to distribute one or more kilograms of heroin and five or more kilograms of cocaine during the time period spanning from late summer 2000 to November 20, 2000. The Government alleged that the Defendant had been recruited to assist Lopez in the collection of proceeds from narcotics sales.

**The Trial**

The Defendants were arrested by agents of the Drug Enforcement Agency ("DEA") on November 20, 2000, during a meeting in a McDonald's parking lot in the Bronx with Noel Espada ("Espada"), who was cooperating with the Government. According to the evidence at trial, Rodriguez is a Columbian national who was sent to the United States by Lopez's Colombian suppliers to help her collect drug proceeds that were owed to her. The purpose of the meeting with Espada, as established at trial, was for Espada to return tens of thousands of dollars of drug proceeds owed by Espada's customers to Lopez and her co-conspirators. During the meeting, Rodriguez spoke to Espada and tried to convince Espada to meet with him to

2

hand over the money; instead, Rodriguez and the others were arrested.

Lopez was one of two cooperating witnesses to testify at trial. The Government turned over all written material, for both witnesses, pursuant to Tile 18, United States Code, Section 3500, on November 9, 2001, four days before opening statements on November 13, 2001. This included certain written Giglio material, such as prior arrest records and cooperation agreements that listed the witnesses' prior criminal activities.

With respect to Lopez, the material disclosed before trial included a detailed statement made by Lopez in connection with the NYPD investigation of the shooting of Edward Montilla, which was an overt act charged in the indictment. In the cover letter accompanying the material, the Government disclosed that, while Lopez and Penaranda were being transported between prisons (and after Lopez had started cooperating with the Government), Penaranda asked Lopez whether "anything had changed and whether she knew to tell the same story that they had already agreed upon." (November 9, 2001 letter to counsel to the Defendants at 2). In court, on November 13, 2001,

3

the Government disclosed that before Lopez began cooperating with the Government, "the Defendants [had encouraged] Lopez to tell a false story of what happened that exculpates the other defendants." (Tr. 3).

Lopez testified on November 15, 16, and 19, 2001. On direct examination, the Government, through questioning of Lopez, revealed that when Lopez first met with the Government, she lied "about everything." (Tr. 342-43). Lopez also testified that she had lied to the police when she was first questioned about the shooting of Montilla in her apartment. (Tr. 406-07). Specifically, Lopez testified that she took the police to a convenience store and told them that the shooting took place in a different location. (Tr. 406). Lopez testified that she lied to the police about the shooting because she was afraid and because "more than anything" she did not want to go to prison because of what had happened in her apartment. (Tr. 407).

The Government offered no elaboration as to what Lopez had lied about and furnished no written reports documenting Lopez's lies.

4

## Lopez's Proffer and Cooperation

Lopez first attended a proffer session with the Government on or about April 18, 2001. During that proffer session, Lopez, in response to various questions about the evidence gathered in the investigation, denied that she had trafficked in drugs, denied that at the time of her arrest she was trying to collect drug money from Espada, and denied that she even knew the purpose of the meeting on November 20, 2000, during which she, Rodriguez, and others were arrested, as described above. Lopez did not proffer any alternative explanation for her (or anyone else's) presence at the meeting with Espada. She further mentioned that during the November 20 meeting, she was lying down in Penaranda's van and couldn't see anything that went on, and she generally denied knowledge of any criminal activity by anyone on or before November 20, 2000.

The Government terminated that first proffer session by informing Lopez that the Government knew she was lying and that, as a result, she could not be offered a cooperation agreement. The Government knew that Lopez was lying based on the following evidence: (1) a large

5

quantity of heroin found in Lopez's home; (2) a ledger found in Lopez's home which contained records of drug transactions between Lopez and her co-conspirators in Lopez's handwriting; (3) taped conversations between Lopez and Espada, setting up the November 20, 2000 meeting for the purpose of Espada returning thousands of dollars in drug money to Lopez; (4) detailed statements by Espada, a cooperating witness who had turned himself in to the DEA, describing Lopez's drug-dealing operation; and (5) detailed statements by Nelson Perez, another cooperating witness who was not called at Rodriguez's trial, describing Lopez's drug-dealing activities.

Lopez returned for a second proffer session on May 4, 2001, and attended an additional 5 proffer sessions with the Government between May 8, 2001 and June 1, 2001. During those meetings, Lopez disclosed her own role in narcotics-trafficking activities, as well as the criminal activities of her co-conspirators, including Rodriguez. Lopez told the Government that she had initially lied to the Government at the urging of the defendants who were arrested with her on November 20, 2000, and that she did so because she was afraid of them. Lopez stated that her co-defendants had told her, after their arrest, that they

6

wanted her to take the blame and exonerate them for any role in the charged conspiracy. Repeatedly, during her period of cooperation, Lopez expressed fear that Rodriguez and her other Colombian co-conspirators would retaliate against her for her cooperation with the Government.

## No Material Exculpatory or Impeachment Information Was Withheld

As the Second Circuit explained, under Brady and its progeny, the Government is required to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." Rodriguez, 496 F.3d 221 at 226 (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). The information must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial." Id. To demonstrate a Brady violation, a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice. United States v. Coppa (In re United States),

7

267 F.3d 132, 140 (2d Cir. 2001) (citing Strickland, 527 U.S. at 281-82). More specifically, in order to show materiality under Brady, a defendant must demonstrate that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); see also United States v. Augurs, 427 U.S. 97, 108 (1976); In re United States, 267 F.3d at 142 ("There is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial.").

The specifics of the initial Lopez session have now been disclosed. The substance of the initial proffer session was not any more material to the defense than the general disclosure that she lied "about everything" during that proffer. In particular, none of the circumstances that the Court of Appeals identified, in which knowing the specifics of a witness's prior lies would have materially advanced the defense, are present here. See Rodriguez, 496 F.3d at 227-28.

8

This is not a situation in which knowing the specifics would have helped the defense bring out information that would have exonerated Rodriguez. Lopez initially told investigators that she did not know the purpose of the meeting at the McDonald's. That lie did not inculpate or exculpate Rodriquez. The undisclosed specifics of the lie did not contain leads to exculpatory evidence. Lopez did not implicate anyone else in the drug-dealing activity, nor did she exonerate Rodriguez.

Knowing that Lopez lied "about everything" permitted Rodriguez to take advantage of Lopez's prior lies to law enforcement and to establish that she changed her story to obtain a cooperation agreement with the Government in the hope of getting a reduced sentence. Knowing that Lopez had lied specifically about not knowing what was going on at the time of her arrest would not have materially aided Rodriguez's cross-examination of her or advanced his defense. At most, knowing the specific lies might have caused Rodriguez to ask Lopez a few more impeaching questions, but cumulative impeachment information is not material or prejudicial in the Brady context. See United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) (noting that "a new trial is generally not required" under Brady

9

when the impeachment evidence at issue "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable") (citations omitted) (citing United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987); United States v. Rosner, 516 F.2d 269, 273-74 (2d Cir. 1975), cert. denied, 427 U.S. 911 (1976)); cf. United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995) (finding that where "witness' plea agreement with the government and his criminal past were dissected and laid before the jury," proof that the witness was "involved in an abortive conspiracy to import heroin and that he violated the policies of [the Gambino organized crime family] would scarcely have rendered his gloomy past worse," and noting that "[n]ondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion.") (citations omitted).

The timing of the disclosure that Lopez lied "about everything" did not affect Rodriguez in any way. The dangers in making late disclosure of Brady/Giglio material, namely that the defense may not have sufficient time to investigate the new information and that "new witnesses or developments tend to throw existing

10

strategies and preparation into disarray," Leka v. Portuondo, 257 F.3d 89, 101 (2d Cir. 2001), are not implicated here. Lopez's general denial of any culpability at her initial proffer did not present any avenue for investigation by the defense and did not have any potential to alter Rodriguez's defense. Before Lopez even took the stand, the defense had already adopted the strategy that Lopez was lying to save her own skin. See, e.g., Tr. 25 (Penaranda opening referring to cooperators as "con artists" who "would say or do anything to help themselves, even at the expense of innocent people"); Tr. 30 (Echivaria opening stating that sometimes criminals tell the truth and sometimes they lie); Tr. 32-33 (Rodriguez opening noting that the jury's "key role" is to "determine credibility" where the "key witness" is Patricia Lopez and reminding the jury that they get to decide if Lopez is telling the truth, regardless of her statements that she is telling the truth); Tr. 35 (Parrado opening noting that it is "all important to determine . . . the credibility of Ms. Lopez); Tr. 38 (Parrado opening stating, with respect to Lopez, "She may not look like a liar, but yet it's going to become clear from her own mouth that's exactly what she is."). The disclosure that Lopez initially lied to the Government supported

11

Rodriguez's defense and did not in any way introduce a new strategy requiring additional investigation. Compare DiSimone v. Phillips, 461 F.3d 181, 197 (2d Cir. 2006) (noting that, "[o]n its face," the Brady material at issue "would likely have altered the defense's cross-examination of [a prosecution witness] and it could even have completely changed the nature of the defense strategy . . . .").

In the instant case, Rodriguez was able to cross-examine Lopez as effectively with the information he had as he would have been with the specifics that he did not know.

Furthermore, "where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin." United States v. Gil, 297 F.3d 93, 103 (2d Cir. 2002) (citation omitted). Here, in addition to Lopez's testimony that Rodriguez had been sent from Colombia by her drug supplier to help collect money owed by her customers, the Government offered detailed evidence of the events immediately leading to the arrest of Rodriguez, Lopez, and their co-defendants on November

12

20, 2000, in the parking lot of the McDonald's restaurant. Prior to the meeting, Espada recorded a telephone conversation with Lopez in which they discussed his delivery of $50,000 in drug money. (Tr. 167-71, 653-54; Gov't Ex. 3). Espada and a DEA agent then drove to the parking lot, where they parked behind a white BMW. Shortly afterwards, Espada received a beep on his pager. Espada returned the page (Tr. 655-56) and, as he placed the call, the agent observed the driver of the white BMW, later identified as Echiveria, answer his cellular phone and pass it to the passenger, later identified as Rodriguez. (Tr. 656). Rodriguez told Espada they were there to collect the money on behalf of Lopez. (Tr. 175-77). When Espada refused to deliver the money without first speaking to Lopez, Echiveria and Rodriguez, who was still on the phone with Espada, exited the BMW, entered the McDonald's restaurant, and stood inside looking around the parking lot, while Rodriguez unsuccessfully continued to try to persuade Espada to show himself. (Tr. 177-81, 659-60). Rodriguez then telephoned Lopez and told her Espada would not speak with anyone but her. Rodriguez gave Echiveria the mobile telephone he had been using, and Echiveria walked from the restaurant to Penaranda's van, where he reiterated Espada's demand. (Tr. 461-62; 660-61).

13

Shortly thereafter, the DEA agents arrested the participants. Rodriguez was taken into custody beside the white BMW. Inside the van, agents found Echiveria, Lopez, Penaranda, and another associate of Rodriguez's, Jose Parrado. (Tr. 182-84, 660-64). Found inside Rodriguez's wallet was a piece of paper with Penaranda's cellular telephone number in Rodriguez's handwriting. (Tr. 415, 466-67; Gov't Ex. 27A). Penaranda's wallet contained a business card bearing, in Rodriguez's handwriting, a cellular telephone number used by Lopez and Rodriguez, as well as Lopez's pager number. (Tr. 418, 426-32; Gov't Ex. 26B). Telephone records also confirmed that the cellular telephone used by Rodriguez and Lopez had been used to call Penaranda and Espada on November 16, 2000, the date Lopez had first arranged to meet with Espada. (Gov't Ex. 44).

Lopez's admission on direct examination that when she first met with the Government she lied "about everything" gave Rodriguez the opportunity to question Lopez as to whether she had revealed the substance of any particular statement she made on direct examination to the Government during her initial proffer. The same lines of

14

questioning were available with regard to Special Agent Antonucci, who was present during the meetings with Lopez, and who testified that he did not take notes during the proffers. Rodriguez did not choose to pursue these lines of examination, either to develop them or to establish any specific difficulties stemming from the lack of interview notes. Instead, Rodriguez directed cross-examination to the point that Lopez had been told to tell the truth in meetings with the Government, but had still lied. (Tr. 565-68). Rodriguez further suggested in the cross-examination that Lopez continued to lie to the Government, citing seven separate meetings that she had with federal agents. (Tr. 568). Rodriguez also questioned Lopez on her decision to lie to the police officers after the shootings of Montilla and Perez, motivated by her desire not to go to jail. (Tr. 572). Counsel also brought out lies Lopez told while illegally entering the United States (Tr. 493-95, 557), and further developed her falsehoods to police officers investigating the shootings of Montilla and Perez (Tr. 512-13, 558, 572; see Tr. 406 (direct)). Rodriguez reiterated some of these points with Special Agent Antonucci, who confirmed that Lopez was informed that she had to tell the truth, but that Lopez "lied about everything" when she began to meet with the Government.

15

(Tr. 726). Rodriquez also elicited from Special Agent Antonucci that during his fifteen or so meetings with Lopez, he never once took notes, a point that other counsel also developed. (Tr. 698-99; see Tr. 741-42). Rodriguez was also able to structure his examinations in such a manner as to avoid eliciting testimony by Lopez that the reason she lied was because her co-defendants had discussed making up a story should the case go to trial. (See Tr. 533, 626). Rodriguez argued in his summation that Lopez was not worthy of being believed (Tr. 925-26, 929, 935, 940).

The details of the first proffer session as disclosed above were not material to Rodriguez's defense, which was not prejudiced by the omission of the specifics, given Lopez's testimony that she lied "about everything". Rodriguez has not established that there is a reasonable probability that the outcome of the proceeding would have been any different had he known what exactly Lopez lied about in her first proffer with the Government. Consequently, I conclude that the Government did not violate its Brady obligations.

So ordered.

New York, N.Y.
March 6, 2008

—————————————
ROBERT W. SWEET
U.S.D.J.